1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10  HORATIUS JOHNSON,                  )  No. CV 04-02674-PJW
                                       )
11              Plaintiff,             )
                                       )
12          v.                         )  MEMORANDUM OPINION AND ORDER
                                       )
13  JO ANNE B. BARNHART, Commissioner  )
    of the Social Security            )
14  Administration,                    )
                                       )
15              Defendant.             )
    _____ )

16

17                            I.

18                       INTRODUCTION

19          Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and

20  1383(c)(3), seeking reversal of the decision by Defendant Social

21  Security Administration ("Agency") denying Supplemental Security

22  Income ("SSI") benefits.  Alternatively, he asks the Court to remand

23  the case to the Agency for further proceedings.  Plaintiff claims the

24  Administrative Law Judge ("ALJ") erred when he: (1) failed to find

25  that Plaintiff met or equaled listing 1.04A, (2) failed to ask the

26  vocational expert a complete hypothetical, and (3) failed to provide

27  clear and convincing reasons for rejecting Plaintiff's subjective

28  symptom limitations.  (Notice of Motion and Motion for Summary

Judgment; Memorandum of Points and Authorities in Support Thereof ("P&A") 4, 6, 7.)  For the reasons discussed below, the decision of the Agency is REVERSED, and this action is REMANDED for further proceedings consistent with this opinion.

II.

BACKGROUND

Plaintiff was born on April 9, 1958, and was 44 years old at the time of his first administrative hearing in 2002.  (Administrative Record ("AR") 95, 237.)  He has a high school education and past relevant work experience as a bus driver, maintenance technician, and truck driver.  (AR 16, 101, 106.)

Plaintiff filed protectively for SSI benefits on August 22, 2001. (AR 95.)  In his application, he alleged disability since June 1, 2001, because of lower back pain.  (AR 95, 100.)  According to Plaintiff, the underlying injury occurred in June 1991, when he fell off a ladder, about one-story high, onto his back.  At that time surgery was recommended, but he chose not to undergo the procedure. After the accident, Plaintiff continued to work until June 2001, when he claims the pain became unbearable.  (AR 143-44.)

The medical record in this case begins in June 2001, when Plaintiff was in county jail and was prescribed Tylenol # 3,

2

1  Flexeril, and one other unnamed muscle relaxant.[1]  (AR 132.)  Eight

2  days later, on June 15, 2001, Plaintiff was prescribed 600 mg of

3  Motrin for back pain.  (AR 131.)

4     Plaintiff's next treatment record is dated September 20, 2001,

5  when he visited the UHP Healthcare Walk-In Clinic ("UHP"), complaining

6  of lower back pain as well as tingling and numbness in his right leg.

7  An x-ray of Plaintiff's lumbar spine was taken, and extra strength

8  Tylenol was prescribed.  (AR 172.)  The following day, September 21,

9  2001, Plaintiff returned to UHP complaining of a migraine.  This time,

10  Plaintiff was given a prescription for Tylenol # 3.

11     On October 2, 2001, Plaintiff underwent a complete orthopedic

12  evaluation by Dr. Lynn Hung at the Manchester Assessment Group at the

13  request of the Agency.  In her report, under the heading of "Station

14  and Gait," Dr. Hung noted:

15     The patient's gait is antalgic.[2]  The patient is unable to

16     perform toe walking, heel walking and tandem walking.  The

17     patient uses a cane for ambulation.  Patient is unable to

18     hop, squat, able to get up from a chair.  Able to get off

19     the exam table with minimum assistance.  (AR 145.)

---

21     [1]  "Tylenol # 3" is also referred to as acetaminophen with
22  codeine or Tylenol with codeine.  It is a narcotic used to treat
   moderate to severe pain.  *See* The PDR Pocket Guide to Prescription
23  Drugs 1312 (David W. Sifton *et al.* eds., 2002).  "Flexeril" (also
   called Cyclobenzaprine) is a muscle relaxant prescribed to relieve
24  muscle spasms resulting from injuries such as strains, sprains, or
   pulls.  *Id.* at 520.  The third medication prescribed to Plaintiff is
25  unreadable.

26     [2]  "Antalgic" is a "neurologic or pharmacologic state in which
27  painful stimuli are so moderated that, though still perceived, they
   are no longer painful."  Stedman's Medical Dictionary: 27th Edition 94
28  (2000).

3

Under the heading of "Lumbar Spine Range of Motion," Dr. Hung noted: "Contour curvature and alignment is normal.  There is moderate spasm and tenderness present."  (AR 145.)  Dr. Hung also noted that Plaintiff demonstrated a decreased range of motion of the spine.[3]  (AR 145.)  Plaintiff tested negative, however, for straight leg raising in both the sitting and supine position, and Dr. Hung detected no atrophy in either of Plaintiff's calves or thighs.[4]  (AR 145-46.)  Under the heading of "Sensation," Dr. Hung noted: "normal to pinprick and light touch throughout upper and left lower extremities, except decreased sensation in right posterior thigh/leg."  (AR 146.)  Under the heading of "Radiology," Dr. Hung noted: "X-ray of lumbarsacral spine shows normal alignment, normal vertebral body height, normal disc space. Essentially, negative."  (AR 147-48.)  Dr. Hung opined that Plaintiff

---

[3]

| | On Exam | Normal |
|---|---|---|
| Flexion: | 30 | 90 |
| Right Bending: | 5 | 20 |
| Left Bending: | 5 | 20 |

[4]  When the straight leg raising test is conducted in the sitting position, the patient starts with his legs dangling at a 90 degree angle.  (The bottom of the patient's foot should be parallel to the floor.)  The doctor then slowly extends the leg, keeping the knee stationary while pulling the heel up towards the ceiling.  When the straight leg raising test is conducted in the supine position, the patient starts by lying face up on a table.  The doctor, keeping the leg straight, then cups his hand under the heel and pulls upward. Both tests are positive when sciatic pain is reported before 70 degrees or when the maneuver elicits an abnormal sensation, such as pain, tingling, or numbness, which radiates down the leg beyond the knee.  *See* U.S. Agency for Health Care Policy and Research, *Acute Low Back Pain Problems in Adults: Assessment and Treatment*, at http://www.chirobase.org/075Strategy/AHCPR/ahcprclinician.html (1994).

4

1  suffered from sacral radiculitis.[5]  She concluded that his prognosis
2  was fair.  (AR 148.)  Based on her evaluation, Dr. Hung concluded that
3  Plaintiff was:

4      [L]imited to lifting and carrying 25 pounds occasionally, 10
5      frequently.  Walking is limited to 6 hours in an 8-hour
6      workday provided use of a cane for longer distance
7      ambulating and frequent rest every hour for 5 minutes.
8      Sitting is limited to 6 hours in an 8-hour workday provided
9      that he is allowed for repositioning every 30 minutes for
10     about 5 minutes of free positioning.  Limited repetitive
11     bending forward, crouching, stooping, and no pushing and
12     pulling.

13 (AR 148.)

14     On October 18, 2001, Plaintiff again visited UHP.  The notes from
15 this visit state that Plaintiff was in no acute distress; his lumbar
16 spine was tender; he tested positive bilaterally when the straight leg
17 raising test was conducted; he was unable to perform range of motion
18 tests or two degrees bend over.  (AR 169.)  Plaintiff was prescribed
19 Naprosyn and Flexeril, and was referred to Martin Luther King Medical
20 Center ("MLK") for an MRI and orthopedic evaluation.[6]  (AR 170.)

21     On October 30, 2001, state agency physician Dr. Charoenrath
22 reviewed Plaintiff's medical records in conjunction with Plaintiff's
23 application for benefits.  Doctor Charoenrath found that Plaintiff's

24

---

25     [5]  "Sacral radiculitis" is a disorder of the spinal nerve root
   affecting a segment of the vertebral column forming part of the
26 pelvis.  Stedman's Medical Dictionary: 27th Edition 1503, 1587 (2000).

27     [6]  "Naprosyn" is a nonsteroidal anti-inflammatory drug used to
   treat mild to moderate pain.  The PDR Pocket Guide to Prescription
28 Drugs 812 (David W. Sifton *et al.* eds., 2002).

5

"alleged pain [was] not credible."  (AR 159.)  In making this
determination, he noted:

> [Orthopedic consultation examination] shows abnormal gait
> and weakness of both lower extremities.  [Plaintiff] alleged
> radiating pain to [right] leg and decreased sensation in the
> [right] posterior thigh.  However, girth measurements are
> [equal in] both thighs and legs.  X-ray L-spine is normal.
> There is no objective evidence to substantiate his pain.

(AR 159.)

Dr. Charoenrath completed a physical residual functional capacity
assessment form at the same time.  In this assessment, he concluded
that Plaintiff was able to lift and carry 50 pounds occasionally and
25 pounds frequently; could stand and/or walk about 6 hours in an 8-
hour workday; and did not need an assistive device for walking.  He
also determined that Plaintiff could sit for about 6 hours in an 8-
hour workday.  In support of these conclusions, he noted that
Plaintiff's lumbar spine x-rays on June 2001 and October 2001 were
normal.  Though Plaintiff demonstrated decreased range of motion and
moderate muscle spasm, the straight leg raising test was negative.
(AR 151.)  There was decreased motion in both hip and knee flexion and
extension, and decreased sensation in his right posterior thigh, but
there was no muscle atrophy.  (AR 152.)  Dr. Charoenrath dismissed
Plaintiff's neurological complaints because of their subjective
nature.  (AR 156.)

On February 11, 2002, Plaintiff again visited UHP complaining of
back pain.  The notes from that visit state that Plaintiff was in no
acute distress.  Plaintiff, however, did exhibit tenderness over the
lumbar spine and tested positive bilaterally in the straight leg

1   raising test.  Plaintiff was prescribed Naprosyn and Flexeril and
2   advised to go to the emergency room if the pain persisted.  (AR 177-
3   78.)

4       On April 11, 2002, Plaintiff went to the Low Back Clinic.  The
5   notes from that visit state that Plaintiff had a decreased range of
6   motion with forward flexion limited to about 60 degrees.  Plaintiff
7   tested positive on the straight leg raising test when it was conducted
8   on his right leg at a 90-degree sitting position, and there was
9   decreased sensation to light touch on the right lateral thigh.
10  Cervical spine and scoliosis tests were negative.  No medications were
11  prescribed, but physical therapy was recommended.  (AR 186.)

12      On April 18, 2002, Plaintiff underwent a physical therapy
13  evaluation.  For some reason, he was unable to complete the evaluation
14  that day, so a follow-up appointment was scheduled.  Plaintiff
15  rescheduled the follow-up evaluation twice before finally completing
16  it on May 22, 2002.  At this appointment, Plaintiff was referred for
17  physical therapy.  Plaintiff's first physical therapy appointment was
18  scheduled for May 23, 2002, but Plaintiff failed to attend or cancel
19  the appointment.  Plaintiff also missed his next two physical therapy
20  appointments, again failing to cancel beforehand.  As a result, he was
21  dropped from the physical therapy program, having never attended a
22  single session.

23      On July 31, 2002, Plaintiff filled two prescriptions, both
24  prescribed by Dr. Chen Yung Chen.  One prescription was for 30 tablets
25  of Tylenol # 3; the other was for 30 tablets of cyclobenzaprine.  Both
26  prescriptions did not allow refills.  On August 22, 2002, Plaintiff
27  received another prescription for Tylenol # 3, this time from Dr.
28  Frank Brown, for 30 tablets with one refill.

1   On September 6, 2002, Plaintiff visited the MLK Neuroscience
2   Outpatient Clinic, complaining of low back pain, numbness, and
3   tingling.  Chart notes state: "Trunk flexion to 70 [degrees] . . . ."
4   (AR 220.)  Plaintiff tested negative when the straight leg raising
5   test was conducted.  No medications were prescribed.  (AR 220.)

6   On October 11, 2002, Plaintiff again visited the MLK Neuroscience
7   Outpatient Clinic, this time requesting a prescription refill for
8   Flexeril and Darvon.[7]  The notes from this visit state that Plaintiff
9   was in no acute distress.  The notes also state, however, that
10  Plaintiff's lumbar spine was tender, and he demonstrated decreased
11  sensation in his anterior tibia.  Plaintiff was prescribed Valium and
12  Flexeril.[8]  (AR 218.)

13  On January 9, 2003, Plaintiff underwent an MRI of his lumbar
14  spine, which was reviewed by Dr. Nicole Stovall.  She found:

15      The bones of the lumbar spine appear of abnormal size,
16      shape, and marrow signal intensity.  There is no evidence of
17      fracture or bony destruction.  The posterior alignment is
18      within normal limits.  There is mild signal intensity at the
19      end-plates of L4-L5 and L5-S1.  There is also moderate disc
20      desiccation at the disc space of L4-L5 and L5-S1.  There is
21      mild narrowing of the right neuroforamina at L4-L5, and
22      moderate narrowing of the left foramina at the level of L4-
23      L5.  There is a mild disc extrusion at the L4-L5 level that

24

25  [7]  "Darvon" is a mild narcotic analgesic prescribed for relief of
26  mild to moderate pain.  The PDR Pocket Guide to Prescription Drugs 337
    (David W. Sifton *et al.* eds., 2002)
27

28  [8]  It appears that three medications were prescribed, but the
    writing describing the third medication is illegible.

1   is left paracentral and left lateral.  There is also
2   compression and swelling of the left L5 nerve root within
3   the left lateral recess of L5, secondary to the disc
4   extrusion.
5  (AR 211.)
6      Dr. Stovall's impressions were:
7  1.   Mild disc extrusion at the L4-L5 disc level with compression
8       of the left L5 nerve root within the left lateral recess of
9       L5.
10  2.   Degenerative changes of the end-plate at L4-L5 and L5-S1
11       level.
12  3.   Narrowing of bilateral neural foramina at L4-L5, right
13       greater than left.
14  4.   Moderate disc desiccation at L4-L5 with disc space
15       narrowing.
16  (AR 211.)
17      There is nothing in the record indicating that Plaintiff sought
18  any medical treatment after January 9, 2003.
19      After Plaintiff's claim was denied initially and on
20  reconsideration, he requested and was granted a hearing before an ALJ.
21  (AR 57.)  On October 3, 2002, Plaintiff appeared with counsel for the
22  hearing.  Plaintiff testified, among other things, that he was
23  experiencing pain on the left side of his lower back, which ran side
24  all the way down to his ankle.  (AR 240.)  Plaintiff reported that he
25  could only walk 10 to 15 yards before he had to rest and wait for the
26  pain to stop.  (AR 241.)  He claimed he could only stand for about 15
27  minutes before the pain became unbearable and he had to sit down.
28  Plaintiff testified that he did not drive, but was able to take the

9

1    bus.  (AR 242.)  He also testified that he was able to bathe, groom,
2    and cook for himself without assistance.  (AR 243.)  Plaintiff told
3    the ALJ that he was taking one tablet of Darvon every four hours and
4    Flexeril three times a day.  He further testified that, because of his
5    pain, he spent the majority of his day lying down.  (AR 243.)

6        On December 24, 2002, the ALJ issued a decision analyzing
7    Plaintiff's claims under the Agency's five-step sequential evaluation
8    process.  (AR 44-48.)  The ALJ found:

9        [Plaintiff] retains the residual capacity [to] lift and
10       carry 25 pounds frequently and 50 pounds occasionally, stand
11       and walk for six hours in an eight-hour workday, and sit for
12       six hours in an eight-hour workday, but cannot do work that
13       involved repetitive bending and stooping.  [¶]  [Further,
14       Plaintiff] remains capable of performing his past relevant
15       work as a bus driver as this work is generally performed in
16       the national economy.  Hence, the [Plaintiff] has not been
17       disabled at any time through the date of this decision.
18   (AR 47.)

19       Plaintiff appealed this decision to the Appeals Council.  By
20   order dated March 31, 2003, the Appeals Council vacated the ALJ's
21   decision and remanded the case for further evaluation and a new
22   decision.  The Appeals Council found:

23       [T]he Administrative Law Judge mischaracterized the medical
24       assessment of the consultative examiner Lynn Hung, M.D.  Dr.
25       Hung gave the claimant the residual functional capacity to
26       lift and carry 25 pounds occasionally and 10 pounds
27       frequently.  She limited [Plaintiff] to walking 6 hours in
28       an 8 hour workday and provided use of a cane for longer

                                  10

distance ambulating with frequent rest every hour for 5 minutes.  She also indicated that the claimant should be allowed repositioning every 30 minutes for about 5 minutes of free positioning and limited repetitive bending forward, crouching, stooping and no pushing and pulling (Exhibit 2F). The Appeals Council believes that this assessment appears to closely resemble light work; however, the Administrative Law Judge stated that the consultant's medical assessment was consistent with essentially medium work and gave the claimant a residual functional capacity for the full range of medium work except to rule out repetitive bending and stooping.  Further evaluation is necessary.

(AR 64-66.)

Thereafter, on July 7, 2003, the ALJ held another hearing.  The testimony provided at this hearing was largely the same as that provided at the October 2002 hearing.  Plaintiff testified that he spent the majority of his day in bed.  (AR 256.)  He claimed that he could only sit for 15 to 20 minutes before the pain became unbearable, and stand for about 30 minutes before he had to rest.  (AR 257.) Plaintiff explained that he took one tablet of Darvocet every four hours and Flexeril two to four times a day.  (AR 261.)  Plaintiff testified that the frequency and magnitude of his pain had increased since the October 2002 hearing, and that he was now required to wear a brace on his left arm because tendinitis developed in his elbow from using the cane.  (AR 255.)

The ALJ also heard testimony from a vocational expert.  The vocational expert testified that Plaintiff's past work experience

11

1   could not transfer to other work.  (AR 266.)  The ALJ then posed the
2   first of three hypothetical questions to the vocational expert:

3       [A]ssume that we had a younger individual with a high school
4       education, and past work as you've described it.  Basically
5       medium, and running from semi-skilled through skilled level.
6       The first hypothetical – I want you to assume this person is
7       limited in ability to lift or carry, push or pull no more
8       than 25 pounds on occasion, or 10 pounds frequently.  That
9       the person can stand and walk up to six hours during the
10      workday with [] an assistive device.  That the person can
11      sit up to six hours during a workday.  That the person can
12      do no repetitive bending, crouching, stooping, and no
13      pushing and pulling.  With those limitations, could such a
14      person perform the [Plaintiff's] – any of the [Plaintiff's]
15      past work?

16  (AR 266-67.)

17      Based on this first hypothetical, the vocational expert concluded
18  that this hypothetical person could not perform any of Plaintiff's
19  past work.  The vocational expert, however, concluded that this
20  hypothetical person could perform work as a parking lot attendant,
21  information clerk, and ticket seller.  (AR 266-67.)

22      The ALJ then posed a second hypothetical question to the
23  vocational expert:

24       Now if we had the same profiled individual with those
25      limitations which I've propounded already, and this time, in
26      addition, I want you to assume that the person cannot sit
27      for more than 15 to 20 minutes continuously without needing
28      to get up and move about.  Cannot stand for more than 30

1          minutes continuously without needing to sit down or rest,

2          for a few minutes at least.  How would that change your

3          answer to the prior hypothetical?

4   (AR 267.)

5          The vocational expert concluded that this second hypothetical

6   person could perform the same type of work as described for the first

7   hypothetical person, but the number of jobs available for this second

8   hypothetical person would be less than those available for the first

9   hypothetical person.  (AR 268.)

10         The ALJ then posed his third and final hypothetical question to

11  the vocational expert:

12         Now if the person had all the limitations which I've already

13         propounded to you in both hypotheticals, but after

14         continuously sitting for 15 to 20 minutes, or standing for

15         up to 30 minutes, the person needs to lie down, how would

16         that change your answer to the hypothetical?

17  (AR 268.)  The vocational expert concluded that this third

18  hypothetical person could not perform any of the jobs.  (AR 268.)

19         On December 16, 2003, the ALJ issued a decision, finding that

20  Plaintiff was not disabled.  (AR 15-20.)  At step one, he found that

21  Plaintiff was not working.  At step two, he found that Plaintiff

22  suffered from obesity and a lumbar sprain, apparently severe

23  impairments.[9]  At step three, the ALJ found that the evidence did not

24  show that the Plaintiff had an impairment or combination of

25  impairments which met or equaled a listing.  (AR 16.)

26

27  _____

28         [9]  Though the ALJ found that Plaintiff was obese, the record
    discloses that Plaintiff was 6'1" and weighed 189 lbs.  (AR 218.)

                                    13

The ALJ concluded that Plaintiff's claims of excess pain and functional limitations were not credible. (AR 19.) Though the ALJ acknowledged that Plaintiff's impairments could produce some symptoms, he determined that these impairments did not impact Plaintiff's ability to "perform work within the parameters of the Administrative Law Judge's functional capacity assessment." (AR 17.)

The ALJ assessed Plaintiff's residual functional capacity as follows:

> [Plaintiff] is only limited by his inability to lift and carry more than twenty-five pounds on an occasional basis and ten pounds on a frequent basis; by his inability to stand and walk for more than six hours in an eight-hour day with an assistive device; by his inability to sit for more than six hours in an eight-hour day; by his inability to do repetitive bending, crouching, or stooping; by his inability to push or pull; by his inability to sit for more than 15 to 20 minutes continuously without needing to get up and move about; and by his inability to stand more than 30 minutes continuously without needing to sit down or rest for a few minutes.

(AR 16.)

The ALJ concluded that Plaintiff's impairments prevented him from performing his former jobs, but could perform other jobs, including information clerk, parking lot attendant, and ticket seller. (AR 18.)

Plaintiff timely requested review of the ALJ's decision. (AR 11.) The Appeals Council denied review, and the decision of the ALJ became the final decision of the Agency. (AR 7-9.) Plaintiff then filed this suit.

III.

STANDARD OF REVIEW

"Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Court may overturn the ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or is based on legal error. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).) It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

"The Court must uphold the ALJ's conclusion even if the evidence in the record is susceptible to more than one rational interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). Indeed, if the record evidence can reasonably support either affirming or reversing the Agency's decision, this Court must not substitute its judgment for that of the ALJ. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the ALJ committed error but the error was harmless, reversal is not required. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2003)(applying the harmless error standard).

15

1                                    IV.

2                               DISCUSSION

3   A.   <u>Listing 1.04A</u>

4          Plaintiff claims the ALJ erred when he failed to find that

5   Plaintiff's condition met or equaled listing 1.04A.  (P&A 4.)  The

6   Agency disagrees.  The Court finds that the record establishes that

7   Plaintiff clearly met some, though maybe not all, of the requirements

8   for listing 104A, yet the ALJ did not discuss the listing at all.

9   Instead, he merely summarily concluded that Plaintiff did not meet the

10  listing.  Because the ALJ failed to explain why Plaintiff's condition

11  did not meet or equal listing 1.04A, this case will be remanded for

12  further proceedings.

13         Listing 1.04A provides as follows:

14         *Disorders of the Spine* (*e.g.*, herniated nucleus pulposus,

15         spinal arachnoiditis, spinal stenosis, osteoarthritis,

16         degenerative disc disease, facet arthritis, vertebral

17         fracture), resulting in compromise of a nerve root

18         (including the cauda equina) or the spinal cord.  With:

19         A.   Evidence of nerve root compression characterized by

20              neuro-anatomic distribution of pain, limitation of

21              motion of the spine, motor loss (atrophy with

22              associated muscle weakness or muscle weakness)

23              accompanied by sensory or reflex loss and, if there is

24              involvement of the lower back, positive straight-leg

25              raising test (sitting and supine). . . .

26  20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04A.

27         The ALJ found that the "medical evidence established that the

28  [Plaintiff] ha[d] [. . .] a lumbar sprain with <u>left</u> lower extremity

                                     16

radiculopathy, but that he [did] not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." (AR 17 (emphasis in original).) The problem with this finding is that the ALJ failed to specify why Plaintiff did not meet or equal the listing, and this Court cannot guess as to how the ALJ made that determination. Further, the ALJ failed to discuss significant probative evidence that suggested that Plaintiff's condition met or equaled some of the symptoms set forth in listing 1.04A, *i.e.,* the ALJ disregarded the fact that Plaintiff twice tested positive in the straight leg raising test and relied instead on the negative results on a different occasion.

In order for Plaintiff to meet listing 1.04A, he had to demonstrate five things: 1) nerve root compression characterized by neuro-anatomic distribution of pain; 2) limitation of motion of the spine; 3) motor loss; 4) sensory reflex loss; and 5) positive results on straight leg raising tests. 20 C.F.R. § 104A. Reviewing each of these requirements in order, it is clear that Plaintiff meets most of them and unclear whether he meets the rest.

1.  Nerve Root Compression Characterized by Neuro-anatomic Distribution of Pain

Under the first prong, Plaintiff must establish nerve-root compression characterized by neuro-anatomic distribution of pain. On January 1, 2003, Dr. Nicole Stovall diagnosed Plaintiff with "compression and swelling of the left L5 nerve root . . . ," based on an MRI of Plaintiff's lumbar spine. (AR 211.) Thus, the record demonstrates that Plaintiff suffered from the requisite nerve root compression. Further, the December 5, 2002 notes from Plaintiff's visit to the King Drew Medical Center Department of Neuroscience

17

1  state: "Findings [consistent with] tibial neuropathy between knee and

2  ankle."[10]  (AR 210.)  Thus, there is some evidence in this record that

3  Plaintiff suffered from neuro-anatomic distribution of pain.  The ALJ,

4  however, did not discuss this point and he should have.  *See Vincent*

5  *v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1995)(finding the ALJ

6  "must make fairly detailed findings in support of administrative

7  decisions to permit courts to review those decisions intelligently").

8        2.   Limitation of Motion of the Spine

9        The next requirement under listing 104A is a limitation of motion

10  of the spine.  The December 5, 2002 King Drew report notes that

11  Plaintiff exhibited significantly less than normal range of motion in

12  his spine.  The other medical records, though not completely

13  consistent, establish that Plaintiff had limitation of motion in his

14  spine.  (AR 159, 169, 186, and 220.)

15        The ALJ is tasked with determining which evidence to accept and

16  which evidence to reject, setting forth the reasons why he chose to

17  rely on one piece of evidence and disregard another.  At a minimum in

18  this case, the ALJ should have set out each instance where Plaintiff's

19  range of motion was assessed and set forth which evidence he was

20  accepting, which evidence he was rejecting, and why.  *Vincent,* 739

21  F.2d at 1395 (holding, among other things, that ALJ's findings "must

22  explain why 'significant probative evidence has been

23  rejected'")(quoting *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir.

24  1981)).  Because the ALJ failed to do this, remand is necessary.

25

26  _____

27        [10]  "Neuropathy" is defined as "any abnormal condition marked by
    swelling and wasting of the nerves . . . ."  The Mosby Medical
28  Encyclopedia: Revised Edition 39 (1992).

3.   Motor Loss (atrophy with associated muscle weakness or
     muscle weakness)

The third requirement for listing 1.04A is motor loss. This is exhibited by an "[i]nability to walk on the heels or toes, to squat or to arise from a squatting position . . . ." 20 C.F.R. Pt. 404, Subpt. P. App. 1(E)(1).

The records indicate that, as early as October 2, 2001, Plaintiff demonstrated motor loss. Dr. Hung noted, "[Plaintiff] is unable to perform toe walking, heel walking and tandem walking. [Plaintiff] uses a cane for ambulation. [Plaintiff] is unable to hop [or] squat . . . ." (AR 144.) Thus, it appears that Plaintiff suffered from motor loss. It also seems clear that Plaintiff suffered from muscle weakness, though probably not atrophy. The ALJ should address this issue on remand.

4.   Sensory or Reflex Loss

The next requirement is sensory or reflex loss. The record consistently demonstrates that Plaintiff suffered from sensory loss. (AR 147, 152, 186, 210, 218.)

5.   Positive Straight Leg Raising Test (Sitting and Supine)

Finally, Plaintiff must show that he tested positive for straight leg raising. It appears that when the straight leg raising test was administered to Plaintiff he tested negative twice, positive twice, and partially positive once. On October 2, 2001, Plaintiff was tested in both the sitting and supine position, and the results were negative.[11] (AR 145.) Just 16 days later, on October 18, 2001,

───────────────

      [11] The straight leg raising test must be conducted in both the sitting and supine position, and a positive response in both positions is required in order to meet listing 1.04A. _See_ 20 C.F.R. Pt. 404,

19

Plaintiff tested positive bilaterally when the straight leg raising

test was conducted.  (AR 169.)  On February 11, 2002, Plaintiff again

tested positive bilaterally when the straight leg raising test was

conducted.  (AR 177.)  On April 11, 2002, Plaintiff's right leg tested

positive when the straight leg raising test was conducted in the

sitting position.  (AR 186.)  On September 6, 2002, Plaintiff tested

negative when the straight leg raising test was conducted.

     The ALJ cited to only one straight leg raising test in his

decision, and that was to the negative finding made by Dr. Hung during

the orthopedic consultation evaluation on October 2, 2001.  (AR 17.)

Not only did the ALJ fail to explain why he relied solely on the

October 2, 2001 negative result, he failed to even mention that

Plaintiff tested positive on the following two occasions when the

straight leg raising test was conducted.  (AR 169, 177.)  Because the

ALJ failed to explain why he disregarded probative evidence--the two

positive straight leg raising tests results--the ALJ's findings are

not supported by substantial evidence.  *See Vincent*, 739 F.2d at 1394-

95 (holding ALJ must explain why significant probative evidence has

been rejected)(quotation marks omitted); *see also Burnett v. Bowen*,

830 F.2d 731, 735 (7th Cir. 1987)("While it is often impracticable and

fruitless for every document to be discussed separately, an

administrative law judge may not select only the evidence that favors

his ultimate conclusion.  His written decision should contain, and his

ultimate determination must be based upon, all the relevant evidence

in the record." (quoting *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th

Subpt. P, App. 1(D).  "Because abnormal physical findings may be
intermittent, their presence over a period of time must be established
by a record of ongoing management and evaluation."  *Id*.

1  Cir. 1984))).   Further, because this listing hinges on highly

2  technical medical determinations, and because the record suggests that

3  Plaintiff meets or equals some of the requirements of listing 1.04A,

4  it is recommended that on remand the ALJ enlist the services of a

5  medical expert to analyze whether Plaintiff's condition meets or

6  equals all of the requirements of listing 1.04A.

7  B.   Hypothetical

8      Next, Plaintiff claims the hypothetical posed by the ALJ was

9  incomplete.   Specifically, Plaintiff claims the ALJ failed to

10  incorporate the limitation of "no pushing and pulling."  (P&A 6.)

11  This is simply incorrect.   The first hypothetical posed by the ALJ

12  stated that "the person can do no repetitive bending, crouching,

13  stooping, and *no pushing and pulling*."  (AR 267 (emphasis added).)

14  The second and third hypotheticals were both based on the initial

15  hypothetical, *i.e.*, "[I]f we had the same profiled individual with

16  those limitations which I've propounded already . . . ."  (AR 267.)

17  Because the ALJ accurately included Plaintiff's physical limitations

18  in the hypotheticals, this claim fails.  *See Embrey v. Bowen*, 849 F.2d

19  418, 422 (9th Cir. 1998)(explaining that a hypothetical is complete if

20  it contains all the limitations and restrictions of the particular

21  claimant).

22  C.   Adverse Credibility Finding

23      Finally, Plaintiff argues that the ALJ failed to articulate clear

24  and convincing reasons to reject his testimony about his pain and

25  related limitations.  (P&A 7.)  This claim is without merit.

26      "Credibility determinations are the province of the ALJ." *Fair*

27  *v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  An ALJ may reject a

28  claimant's testimony, but must identify the incredible testimony and

1  specify the evidence that undermines that testimony.  *See Lester v.*
2  *Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  It is well-established that
3  the ALJ may consider "the claimant's daily activities, inconsistencies
4  in testimony, [and the] effectiveness [. . .] of any pain medication"
5  when making credibility determinations.  *See Orteza v. Shalala*, 50
6  F.3d 748, 750 (9th Cir. 1995).  As long as the ALJ's credibility
7  finding is supported by substantial evidence in the record, this Court
8  may not second-guess it.  *See Morgan*, 169 F.3d at 600.

9      In this case, the ALJ found that Plaintiff had impairments which
10  could produce some symptoms of pain.  (AR 17.)  As a result, the ALJ
11  could not reject Plaintiff's "subjective complaints based solely on a
12  lack of medical evidence to fully corroborate the alleged severity of
13  the pain."  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).
14  Further, because the ALJ made no finding of malingering, he was
15  obligated to state "clear and convincing" reasons for rejecting
16  Plaintiff's pain testimony.  *Id.*

17      The ALJ found that Plaintiff was not credible because: (1)
18  Plaintiff was not prescribed narcotic pain relievers on a repeated
19  basis, (2) on several occasions Plaintiff's doctors reported that he
20  was not experiencing acute distress at the time of his examination,
21  (3) Plaintiff failed to complete the recommended physical therapy, and
22  (4) there was no evidence that Plaintiff received any type of medical
23  treatment for the 11-month period immediately prior to the ALJ's
24  decision.  (AR 17-18.)

25      1.  <u>Prescriptions for Narcotics</u>

26      The first reason the ALJ gave for rejecting Plaintiff's
27  credibility was Plaintiff's failure to receive "a narcotic medication,
28  on a repeated basis, to treat his complaints of pain."  (AR 17.)  In

                                    22

1   making this determination, the ALJ cited four instances when Plaintiff
2   was prescribed pain medication that was non-narcotic.  (AR 17.)  The
3   ALJ, however, overlooked the fact that, from July 7, 2001, to October
4   11, 2002, Plaintiff was prescribed Tylenol with codeine, a narcotic
5   used to treat moderate to severe pain, six times.  (AR 132, 171, 199,
6   202, 218, 222.)  In some instances the prescription was for 30 tablets
7   with a refill.  (AR 199.)  In other instances the record fails to
8   specify the number of tablets and whether a refill was authorized.
9   (AR 132, 171, 218, 222.)  Regardless, this basis for the ALJ's
10  rejection of Plaintiff's credibility is not supported by the record.

11          2.   <u>No Acute Distress</u>

12          The ALJ's second reason for rejecting Plaintiff's credibility,
13  was the fact that, on several occasions, Plaintiff's doctors reported
14  that he was in no acute distress, which the ALJ found contradicted
15  Plaintiff's allegations of severe and unrelenting pain.  (AR 17-18.)
16  While it is true that an "ALJ may not discredit pain testimony merely
17  because a claimant's reported degree of pain is unsupported by
18  objective medical findings," *see Fair*, 885 F.2d at 602, the ALJ is
19  allowed to use the lack of medical evidence--such as various doctors
20  describing Plaintiff as being in no acute distress--as a basis for
21  discounting Plaintiff's pain testimony.  *See Burch*, 400 F.3d at 681
22  ("Although lack of medical evidence cannot form the sole basis for
23  discounting pain testimony, it is a factor the ALJ can consider in his
24  credibility analysis.").  The ALJ's reliance on the doctors' findings
25  that Plaintiff was not in acute distress at the time of his treatment
26  was proper and supports the ALJ's finding on credibility.

27

28

3.   <u>Physical Therapy</u>

The ALJ's third reason for rejecting Plaintiff's credibility was the fact that he did not complete recommended physical therapy.   (AR 18.)   The ALJ is allowed to consider Plaintiff's "failure to follow a prescribed course of treatment" in evaluating an allegation of pain. *Fair*, 885 F.2d at 603.   This reason is also a proper consideration for finding that Plaintiff was not credible, *Burch*, 400 F.3d at 680, and is supported by substantial evidence in this record.

4.   <u>Lack of Recent Medical History</u>

The ALJ's last reason for rejecting Plaintiff's credibility was the fact that Plaintiff had not sought medical treatment for 11 months prior to the ALJ's decision.   The ALJ reasoned that Plaintiff would have been receiving regular medical treatment if he had been suffering from disabling pain.   (AR 18.)   "[F]ailure to seek treatment" is evidence that claims of pain are not credible. *Fair*, 885 F.2d at 603. Thus, this reason, too, is a legitimate reason for rejecting Plaintiff's credibility and is supported by this record.

In the end, the Court concludes that, because Plaintiff failed to complete the recommended physical therapy, was consistently observed to be in no acute distress, and did not seek medical treatment for the 11-month period prior to the ALJ's decision, the ALJ's finding that Plaintiff was not credible was supported by substantial evidence and will not be disturbed.

24

1

V.

2

CONCLUSION

3      For the reasons set forth above, the Agency's decision is

4  reversed and the case is remanded for further proceedings consistent

5  with this opinion.

6      IT IS SO ORDERED.

7      DATED:    August __16___, 2005.

8

9                                      /s/

10                         _____
                           PATRICK J. WALSH
11                         UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  S:\PJW\Cases-Soc Sec\JOHNSON, H 2674\Memo_Opinion.wpd